1 ARMSTRONG & ASSOCIATES, LLP.
William H. Armstrong (SBN 40650)
2 One Kaiser Plaza, Suite 625
Oakland, California 94612
3 Telephone: (510) 433-1830
Facsimile: (510) 433-1836
4
LAW OFFICES OF MIRIAM HISER
5 MIRIAM HISER (SBN 129824)
550 Montgomery Street, Suite 650
6 San Francisco, California 94111
Telephone: (415) 345-9234
7 Facsimile: (415) 395-9372
mhiser@hiserlaw.com
8
Attorneys for Appellant
9 Double Bogey, L.P.,
A California Limited Partnership
10

11                         UNITED STATES DISTRICT COURT
12                       NORTHERN DISTRICT OF CALIFORNIA
13

| 14 | DOUBLE BOGEY, L.P., A CALIFORNIA | Case No. 3:12-cv-01877 SI |
| 15 | LIMITED PARTNERSHIP, | [Bankr. Case No. 09-46304 |
| 16 | Appellant, | Adv. Proc. No. 11-3017 |
| 17 | v. | Adv. Proc. No. 11-3018] |
| 18 | SYLVESTER FRANK ENEA and PAUL | [Consolidated] |
| 19 | JOSEPH ENEA, | |
| 20 | Appellees. | **OPENING BRIEF OF APPELLANT DOUBLE BOGEY, L.P., A CALIFORNIA LIMITED PARTNERSHIP** |

21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES……………………………………..………..…i

STATEMENT OF THE BASIS OF APPELLATE JURISDICTION………………..1

STATEMENT OF THE ISSUES PRESENTED AND THE APPLICABLE STANDARD OF APPELLATE REVIEW…………………………………..1

STATEMENT OF THE CASE……………………………………..1

STATEMENT OF FACTS……………………………………...3

SUMMARY OF ARGUMENT……………………………………8

ARGUMENT

I.      The Bankruptcy Code Does Not Allow Debtors To Walk Away From Debts Listed in Section 523 Of the Code......................................9

II.     Double Bogey Proved Defalcation By A Fiduciary……………………9

a.      Appian Was Nominally a Fiduciary To Double Bogey Under Section 523(a)(4) with Respect to Double Bogey's Investments in Both Monticello and Monterrosa……………………………...9

b.      Appian Was Nominally The Trustee Over and Had to Account For All Assets of Monticello and Monterrosa……………………..10

c.      Neither Appian Nor its Alter Ego Accounted Fully For Double Bogey's Investment Nor Paid Over to Double Bogey Money Admittedly Owed To It: Under Applicable Ninth Circuit Authority, This Is Defalcation…………………………………...12

III.    The Eneas Are Liable for The Defalcation Under Section 523(a)(4) Either As Appian's *Alter Ego* Or Directly........................................14

a.      The Eneas Are Liable for the Defalcation As Appian's *Alter Ego*…. 14

b.      The Eneas Are Also Directly Liable for The Defalcation……………20

CONCLUSION……………………………………………21

1

# TABLE OF AUTHORITIES

2    **Cases**                                                                                 **Page(s)**

3    *Andrews Farms v. Calcot, Ltd.*, 527 F.Supp.2d 1239 (E.D. Cal. 2007) ........................ 12

4    *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal. App. 2d 825 (1962) ........................... 14

5    *Banayan v. Mesbahi (In re Mesbahi)*, 2005 Bankr. LEXIS 3398 (B.A.P. 9th Cir. 2005)............ 15

6    *Banks v. Gill Distrib. Ctrs., Inc. (In re Banks),* 263 F.3d 862 (9th Cir. 2001) .............................. 9

7    *Blyler v. Hemmeter (In re Hemmeter),* 242 F. 3d 1186 (9th Cir. 2001) ................................. 12, 18

8    *Board of Trustees of the Mill Cabinet Pension Trust Fund v. Valley Cabinet*,

9    877 F.2d 769 (9th Cir. 1989) ........................................................................ 15

10   *Bombardier Capital v. Black (In re Black),* 179 B.R. 509 (Bankr. E.D. Tex. 1995)................... 16

11   *Cantrell v. Cal-Micro, Inc. (In re Cantrell)*, 329 F.3d 1119 (9th Cir. 2003)......................... 18, 19

12   *Capitol Indemnity Corporation v. Interstate Agency (In re Interstate Agency, Inc.),*

13   760 F.2d 121, (6th Cir. 1985) ..................................................................... 20

14   *Cohen v. De La Cruz*, 523 U.S. 213 (1998) ............................................................ 9

15   *Davis v. Aetna Acceptance Corp.*, 293 U.S. 328 (1934)…………………………………………19

16   *Federal Deposit Ins. Corp .v. Jackson*, 133 F.3d 694 (9th Cir. 1998) ....................................12

17   *Goodrich v. Briones (In re Schwarzkopf),* 626 F.3d 1032 (9th Cir. 2010)……………………   .15

18   *Hodnett v. Loevner (In re Loevner),* 167 B.R. 824 (Bankr. E.D. Va. 1994)......................... 15, 16

19   *Hunter v. Philpott*, 373 F.3d 873 (8th Cir. 2004) ................................................... 18

20   *In re Munson*, 2011 Bankr. LEXIS 764 (Bankr. S.D. Cal. 2011)……………………………17,18

21   *Landis v. Scott*, 32 Pa. 495 (Pa. 1859) ............................................................... 13

22   *Lewis v. Scott (In re Lewis),* 97 F.3d 1182 (9th Cir. 1996)................................... 10, 11, 12

23   *Lewis v. Short (In re Short),* 818 F.2d 693 (9th Cir. 1987)………………………………………12

24   *Martin v. Fidelity & Deposit Co.* (*In re Martin)*, 161 B.R. 672 (B.A.P. 9th Cir. 1993) ............. 12

25   *Mesler v. Bragg Management Co.* 39 Cal. 3d 290 (1985) ........................................... 14

26   *Morris Okun Inc. v. Harry Zimmerman, Inc.,* 814 F. Supp. 346 (S.D.N.Y. 1993)………………20

27   *Nibbi v. Kilroy (In re Kilroy),* 357 B.R. 411 (Bankr. S.D. Tex. 2006) ....................... 16

28

1    *Otto v. Niles (In re Niles),* 106 F.3d 1456 (9th Cir. 1997)...................................... 9, 10,.11, 12, 13

2    *Patel v. Shamrock Floorcovering Services, Inc. (In re Patel),* 565 F.3d 963 (6th Cir. 2009)...... 15

3    *Peerless Ins. Co. v. Casey (In re Casey),* 181 B.R. 763 (Bankr. S.D.N.Y. 1995) ................. 16, 20

4    *Ragsdale v. Haller,* 780 F.2d 794 (9th Cir. 1986) .............................................. 9, 10, 12

5    *Riddle v. Leuschner,* 51 Cal. 2d 574 (1959) ................................................................. 14

6    *Rogone v. Correia-Sasser (In re Correia-Sasser)*, 2011 Bankr. LEXIS 3072 (Bankr. 2011)...... 12

7    *Seymour v. Hull & Moreland Engineering*, 605 F. 2d 1105 (9th Cir. 1979)............................... 14

8    *Sherman v. SEC (In re Sherman)*, 658 F.3d 1009 (9th Cir. 2011)......................................... 19, 20

9    *Stevens v. Briles (In re Briles*), 228 B.R. 462 (Bankr. S.D. Cal. 1998)....................................... 12

10    *Sweet v. Watson's Nursery*, 33 Cal.App. 2d 699 (1939) .................................................. 14

11    *Toubin v. Sans Souci (In re Toubin),* 258 B.R. 199 (B.A.P. 9th Cir. 2001) ................................ 15

12    *UA Local 343 v. Nor-Cal Plumbing*, 48 F.3d 1465 (9th Cir. 1995) .......................................... 15

13    *United Student Aid Funds, Inc. v. Pena (In re Pena),* 155 F.3d 1108 (9th Cir. 1998) ................... 1

14    *Watson v. Commonwealth Ins. Co.*, 8 Cal. 2d 61 (1936)................................................... 14

15    *Weule v. Nordstrom*, 8 Fed. Appx. 823 (9th Cir. 2001)...................................................... 15

16    *Woodworking Enterprises, Inc. v. Baird (In re Baird),* 114 B.R. 198

17     (B.A.P. 9th Cir. 1990)........................................................... 12, 13, 14, 15, 20

18    *Yarbrow v. FDIC (In re Yarbrow),* 150 B.R. 233 (B.A.P. 9th Cir. 1993) ................................... 15

19    *ZTE Inc. v. Amoroso*, 223 Fed. Appx. 708 (9th Cir. 2007) ........................................... 15

**Statutes**

20   

21    11 U.S.C. Section 523(a)(2)....................................................................... 3

22    11 U.S.C. Section 523(a)(4)................................................................... passim

23    11 U.S.C. Section 523(a)(6)..................................................................... 3, 15

24    California Corporations Code § 15021 ......................................................... 10

25    California Corporations Code § 17153…………………………………………………9

**Other Authorities**

26    *A Guide to Winning Alter Ego Claims*, Elizabeth E. Brown, American Bankruptcy Institute

27     Journal, June 1996, 15-5 ABIJ 15........................................................... 14

28    *Bankruptcy Law and Practice*, Daniel R. Cowans, S 16.8, p. 147 (7th Ed. 1998)....................... 15

1

**STATEMENT OF THE BASIS OF APPELLATE JURISDICTION**

2

3       Double Bogey, L.P. ("Double Bogey") appeals from Judgments entered in these

4    consolidated adversary proceedings on February 24, 2012 in A.P. No. 11-3017 and February 28,

5    2012, in A.P. No. 11-3018.  The Judgments granted defendants' Motion to Dismiss at the

6    conclusion of Double Bogey's case-in-chief pursuant to Federal Rule of Civil Procedure 52(c).

7    Double Bogey filed its Notice of Appeal on March 8, 2012.  This appeal is timely pursuant to

8    Federal Rule of Bankruptcy Procedure 8002.  This Court has jurisdiction of this appeal pursuant

    to 28 U.S.C. Section 158(b)(1).

9

**STATEMENT OF THE ISSUES PRESENTED AND THE**
**APPLICABLE STANDARD OF APPELLATE REVIEW**

10

11       Under the Bankruptcy Code, a debt "for defalcation…while acting in a fiduciary

12    capacity" is non-dischargeable.  11 U.S.C. Section 523(a)(4).  Defalcation includes the failure to

13    account for money entrusted to a fiduciary and the failure to pay money when owed.  The Court

14    found that Appian Construction Company, Inc. ("Appian") was a fiduciary to plaintiff; that

15    plaintiff was owed substantial amounts of money by Appian; and that plaintiff had established a

16    *prima facie* case that Paul and Sylvester Enea were Appian's *alter ego*.  Did the Court err when

17    it held that plaintiff had not established a *prima facie* case of defalcation against the Eneas—

18    either directly or as Appian's *alter ego*?  The appellate court reviews the bankruptcy court's

19    findings of fact under the "clearly erroneous" standard and its conclusions of law "de novo."

20    *United Student Aid Funds, Inc. v. Pena (In re Pena),* 155 F.3d 1108, 1109 (9th Cir. 1998).

21

**STATEMENT OF THE CASE**

22       Double Bogey invested $5.259 million in two residential real estate development entities,

23    1221 Monticello Partnership, L.P. ("Monticello") and Monterrosa, a Limited Liability Company

24    ("Monterrosa").   Defendants Paul and Sylvester ("Vesty") Enea controlled and managed

25    Monticello and Monterrosa through Appian Construction Company, Inc. ("Appian"); Appian

26    was nominally the general partner in Monticello and the managing member of Monterrosa.

27    Monticello developed and sold 19 high end homes between 1997 and 2007.  Monterrosa

28    acquired one property, in December 2006, which it lost through foreclosure.  *(Declaration of*

*Dianne L. Forde CPA On Direct Examination ("Forde Direct") ¶¶ 8, 12; Plaintiff's Trial Exhibits 1 and 2, Amended and Restated Limited Partnership Agreement of 1221 Monticello, L.P. ("Monticello Agmt"), Operating Agreement of Monterrosa, a Limited Liability Company ("Monterrosa Agmt").*

Double Bogey demanded an accounting of its investment in September 2007, after the last Monticello home sold.  The Eneas failed to provide that accounting or pay Double Bogey the returns it was due, and in September 2008, Double Bogey filed suit against them and Appian in state court.  *(Forde Direct ¶ 2).*  The Eneas filed chapter 7 bankruptcy petitions in July and September 2009, before a scheduled November 23, 2009 trial date.  *(Id. ¶ 3).*  On November 23, 2009, Appian filed a chapter 7 petition.

On September 22, 2009, Double Bogey filed two separate adversary Complaints against the Eneas, alleging that the debt owed to Double Bogey was non-dischargeable under Sections 523(a)(2), (4) and (6) of the bankruptcy code.  It filed First Amended Complaints on October 20, 2009, and on December 10, 2009, the court consolidated the cases for all purposes.  Double Bogey filed a Motion for Summary Adjudication on January 31, 2011, which was denied.[1] *(Order, April 6, 2011).*

Double Bogey dismissed its claims under Section 523(a)(6) against both Eneas by Stipulation before trial, and the court granted a motion *in limine* with respect to its Section 523(a)(2) claim.  Double Bogey then presented its case against Paul and Vesty Enea for "defalcation…while acting in a fiduciary capacity" under Section 523(a)(4) in a five day trial..  The Eneas moved for Judgment pursuant to Rule 52.  (*Transcript of Trial Proceedings ("TR") Dec. 28 p. 75 et seq).*  Following argument and supplemental briefing, the Court granted the Motion and entered Judgment in favor of the Eneas.  *(Judgments Re Dischargeability of Indebtedness February 23, 2012, February 27, 2012).*  This appeal followed.

///

///

---

[1]  Because the assigned judge had retired, and his successor had not yet been appointed, filing of the Motion for Summary Judgment prompted transfer of the cases to the San Francisco bankruptcy court where they were assigned the current adversary numbers.

**STATEMENT OF FACTS**

**Double Bogey's Investment in Monticello and Monterrosa:** The parties formed Monticello in 1997 with Appian as the nominal General Partner and Double Bogey its Limited Partner.  The parties formed Monterrosa in 2003, with Appian as the nominal Managing Member and Double Bogey a passive, Investing Member.  Between 1997 and 2002, Double Bogey contributed $4.159 million in capital to Monticello pursuant to the Monticello Agreement.  *(Forde Direct ¶ 7, Monticello Agmt Section 2.2)*  Double Bogey invested another $1.1 million in Monterrosa between July 2003 and June 2006 pursuant to the Monterrosa Agreement.  *(Forde Direct ¶ 12, Monterrosa Agmt Ex. A).*

**Established facts relating to "alter ego."**  Paul and Vesty Enea did not respect corporate formalities with regard to documenting their ownership in the corporation, their distribution of profits, their salaries or other compensation.  Paul Enea became president and ostensible 100% shareholder of Appian in 1993.  *(Defendants Ex. H-15; TR Dec. 7 p. 572:23-24).*  Prior to that time, the company had held annual meetings, held and documented board of directors meeting and issued corporate resolutions for loans and other corporate actions.  *(Defendants' Ex H).*  After that, specifically from 1997 on—when Double Bogey began investing—the company ceased holding annual meetings and board of directors meetings and from that time on Paul and Vesty simply took out whatever money they felt appropriate from the company**.**[2]

Although Paul testified that he was the "one hundred percent shareholder" of Appian, and that he and Appian "[were] one and the same," Appian "never issued a share certificate" to him.  *(TR Dec. 7 p. 541:1-3, 540:7-9, 542:14-16).* [3]  And despite his purported sole "ownership" of Appian, Paul and Vesty, his brother, had a "verbal 50/50" agreement to split Appian's profits and did in fact split those profits between them.  *(TR Dec. 7 p. 572:16-23; TR Dec. 27, p. 100:4-*

---

[2] In fact, Defendants own exhibit H-labeled minutes of these meetings, stops in 1997; apparently the last Board meeting occurred in January of that year.
[3] The Court found that the "fact" of Paul's sole ownership of Appian, Fact No. 5 in its April 6, 2011 Order denying the motion for summary judgment, was in error, based on the testimony related to the Eneas 50/50 split/ownership of Appian.  *(TR Dec. 7 p. 576:10-577:5, 581:13-583:22).*

Opening Brief of Appellant Double Bogey
                                        3:12-cv-01877 SI

1   *10; Defendants' Ex. M).*  Paul Enea testified that the brothers made efforts at the end of each

2   year to make sure each had taken the same amount from Appian .  *(TR Dec. 7 p. 544:25 to*

3   *545:3).*

4        Vesty Enea consistently listed a "50% stake" in Appian's "stock" as an asset in his

5   personal financial statements from 2004 to 2008 *(TR Dec. 27 110:15-18, 111:16-112:8).*  In

6   2003, Vesty wrote WestAmerica Bank—Appian's primary banker—that he and Paul planned to

7   split Appian's profit of $250,000 "50/50" from the sale of the first home in the Monticello-

8   Crossbrook project.  *(TR Dec. 27, p. 104:12-105:2).[4]*   (The Eneas later told Double Bogey that

9   the Crossbrook project was a "loss."  *(Id.)*)  Vesty also listed Appian's stock as his personal asset

10  in a financial statement he submitted to Diablo Valley Bank in conjunction with a loan request,

11  although as indicated, no Appian stock certificates were ever issued *(TR Dec. 27, p.101:22-*

12  *103:13 and Plaintiff's Ex. 111).*

13       The Eneas maintained a rough 'ledger' detailing how much each had taken from Appian

14  so that they could maintain the 50/50 split.  This 'ledger'—Defendants' Trial Exhibit M—begins

15  in 1999[5] and continues to 2006 (with a few years missing), lists how much each brother received

16  from Appian by year, and contains a running "balance" between the two Eneas when one took

17  out more than the other in a given year.  *(TR Dec. 27, p. 29:20-23; 33:7-34:15).*   It is essentially

18  a record of money paid to each brother, without characterizing the payments as profit

19  distribution, salary, or anything else, and money either brother had caused Appian to pay on his

20  personal behalf.

21       As Exhibit M details, Appian paid both Eneas' personal expenses—in 2002 alone it paid

22  $95,613 in personal expenses for Paul *(TR Dec. 27, p. 56:11-20).*  Specific personal expenses

23  included Round Hill golf club memberships *(Defendants' Ex. M-1, 9, 18, 28);* family vacations

24  to Hawaii *(M-2, 19, 23, 29);*[6] homeowners dues and incidentals for Paul's family property in

25

26  [4]  Appian transferred $260,000 to itself from the Monticello bank account just after the first
    Crossbrook house sold on November 24, 2003, never explaining the business reason for the
27  transfer.  *(Forde Direct, Appendix 1, ¶ VIII.B.).*
    [5]  Judy Jarvis, the bookkeeper the Eneas hired in 1999, created Exhibit M, but the Eneas'
28  agreement to share 50/50 in Appian apparently began before then.
    [6] Most of these items Paul charged to the Appian corporate American Express card.  *(See*
    *Plaintiff's Exhibit 45, Appian credit card statements).*

1    Tonopalo, Tahoe *(M-29; TR Dec. 27, p. 72:1-14);* Vesty's wife Mimi's cell phone and shopping

2    charges *(M-23, 29-30)*.  After 2006, Appian continued to pay the Eneas personal expenses.  *(TR*

3    *Dec. 27, p. 74:4-18).*

4         The ledger also lists the Enea's "draws" from Appian, although there are no records of

5    corporate action setting compensation for either Paul or Vesty Enea.  Neither Paul nor Vesty, a

6    "consultant" to Appian, had a written agreement with Appian.[7]  *(TR Dec. 7 p. 544:3-21; TR*

7    *Dec. 27, p. 173:12-21).*    What each took from Appian varied widely.  For instance, in April

8    2002, Paul took $101,617.30; in March, he had taken $38,545.42; in later months he took

9    $10,000 or $20,000.  *(TR Dec. 27, p. 48-49)*   Paul was unable to articulate a reason or method

10   for how much Vesty took and when; sometimes Vesty would just call and say he was "going to

11   take a check."   *(TR Dec. 27 p. 49:17-51:7)*   Paul did confirm that, by 2002, Vesty had taken

12   $336,584 more out of Appian than he had.

13        Both Eneas treated Appian's money as if it were their own.  Paul used Appian's money to

14   repay a $75,000 personal loan from Judy Jarvis, the Appian bookkeeper.  *(TR Dec. 27 p. 12:9-*

15   *13:25, Plaintiff's Exhibit 108).*  He also repaid a personal $75,000 loan from Appian's bank

16   account.  *(TR Dec. 7, p. 529:6-22; 533:19-534:1, 534:3-8).*   Paul also had Appian pay $138,290

17   and $36,380 for his delinquent federal and state income taxes in 2003.  *(Forde Direct ¶ 50(b)).*

18   In 2005, he had Appian take $300,000 from Monticello via "misc. debit" (a transaction not

19   recorded in Appian's books and records), which Paul then used to pay $100,528 to the IRS for

20   his delinquent personal income taxes.  *(Forde Direct ¶ 50(a)).*  Paul also used $101,617 from

21   Appian's bank account as a down payment on his personal residence.  *(Id. at ¶ 50(c))*[8]

22        Paul also routinely used Appian funds to pay personal charges he and his wife incurred

23   on the Appian American Express card—including family trips to Hawaii and Disneyland.  *(Id. at*

24   *¶ 50(d) and Ex. M)* .  Paul also paid his separate, personal, credit card bills from Appian's bank

25   account.  *(Forde Direct ¶ 50(f)).*

26

27   ―――――――――――
     [7] Dianne Forde found no documents setting the amount or schedule of payments to either Enea.
     *(TR Dec. 6, p. 272:2-274:3).*

28   [8] The only "record" of these personal transactions—other than the source documents Dianne
     Forde located showing the withdrawals and transfers from bank accounts—is Exhibit M, The
     transactions discussed above were uncovered only after much work by Ms. Forde, Bogey's

1    Vesty Enea routinely used Appian's funds to replenish his personal accounts when those

2  accounts were overdrawn or close to it.  He did so by first taking the money from Monticello or

3  Monterrosa's accounts—in various amounts, depending on how much he needed at the time—

4  putting it into a bank account in Appian's name, then paying himself from there, usually doing

5  all the transfers in the same day.  *(Id. at ¶ 29(a) to (g)).*

6    The Eneas did not maintain adequate corporate books and records for Appian or for

7  Monticello and Monterrosa.  To the contrary, Ms. Forde testified that all three entities' records

8  were "the worst set of books and records and accounting that I've ever seen in thirty years." *(TR*

9  *Dec. 6 p. 258:12-17).*  Deficiencies included commingled, un-reconciled and inconsistent

10  records, lack of supporting documentation for disbursements, and missing bank statements and

11  partnership books and records.  *(Forde Direct ¶¶ 14(a), ¶¶ 15-22).*

12    The Eneas also took and gave undocumented loans to related entities which were not

13  repaid.  For instance, the Eneas transferred $184,000 from Monticello nominally to Appian as a

14  "loan" for use on an Appian project unrelated to either Monticello or Monterrosa; Appian

15  apparently did not repay this "loan." *(Forde Direct ¶ 50(g), Ex. 61 to Forde Direct).*  Appian

16  also "loaned" $400,000 to Enea Brothers LLC, a company owned by Paul and Vesty—but which

17  Vesty admitted did not do business with Appian—at zero interest; this "loan" was not repaid but

18  was listed by Appian as an outstanding obligation in its bankruptcy schedules *(Forde Direct ¶*

19  *53; TR Dec. 7, 547:22-549:17; TR Dec. 27, 181:4-10, 182:23-183:8).* Vesty also took a personal

20  loan of $10,000 from Monterrosa *(Forde Direct ¶ 36, Ex. M-26).*

21    The Monticello Agreement required the partnership to make distributions on the sale of

22  each house by Monticello in the following order: return of Double Bogey's (the Limited Partner)

23  capital contribution; payment of Appian's "construction fee"; payment of Double Bogey's

24  preferred return; payment of an amount equal to the preferred return to Appian; then a 50/50

25  split.[9]  *(Monticello Agmt ¶ 5.1, Plaintiff's Ex. 1)*  Monticello had its own bank accounts, from

26  which money should have been distributed to Double Bogey and to Appian, in accordance with

27

28  _____

[9] Though the formula called for re-payment of Appian's capital contribution, Appian committed to only a $3,085 capital contribution; Ms. Forde found no record of that contribution.  *(Forde Direct ¶ 8).*

6    Opening Brief of Appellant Double Bogey
     3:12-cv-01877 SI

1  | this formula.

2  | Instead, at the close of almost every escrow, the proceeds were immediately "swept"

3  | from Monticello's account to Appian's, with no substantiation for the transfer.  This "sweeping"

4  | started with the first house sold—10 Monticello Court—on December 23, 1998.  That same day,

5  | ¾ of the $310,588 escrow proceeds were transferred to Appian; within a month, $400,000 had

6  | been transferred to Appian and no distributions made to Double Bogey.  *(Forde Direct ¶ 27(a).*[10]

7  | These monies were not Appian's construction fee, which was paid separately, and none of the

8  | transfers to Appian were posted as withdrawals on the Appian records.  *(Id.)*  This pattern

9  | continued through the end of the partnership.  When two Vine Lane homes sold, Appian took

10 | $595,000 for itself—not as a construction fee, not to cover payments to vendors—and paid

11 | Double Bogey nothing.  During the Vine Lane project alone, there were an aggregate of

12 | $2,732,815 in unsubstantiated cash transfers from Monticello to Appian.  *(Id. at ¶ 27 (g)).*

13 | **Established facts relating to defalcation:**  Double Bogey entrusted $4.159 million with

14 | Appian for Monticello.  *(Forde Direct ¶ 7).*   Appian returned only $41,259 more than this to

15 | Double Bogey, for a return of less than 1%.  *(Id. ¶ 9).*  In contrast, the Eneas directed

16 | $10,928,658 to Appian from Monticello.  *(Id. ¶ 10, column (d)).*   The Eneas did not substantiate

17 | the business purpose for $6,926,550 of this amount.  *(Id.).*  They returned *none* of the $1,100,000

18 | Double Bogey invested in Monterrosa, claiming that all the investors in Monterrosa lost their

19 | money.  *(Id. ¶ 12)*  They did, however, transfer $1,054,491 to Appian from Monterrosa's bank

20 | account, again with no substantiation.  *(Id. ¶ 13).*

21 | At trial, Paul Enea admitted that Appian owed Double Bogey at least $1,600,000,

22 | $808,000 from the Vine Lane projects and an additional approximately $884,000 owed from

23 | projects prior to Vine Lane.  *(TR Dec. 6, 335:7-16, Dec. 27, 94:3-14-Vine Lane) (TR Dec. 7,*

24 | *417-423, Dec. 6, 354:5-12, 355:11-17; 356:13-364:20-amounts owed Appian under Section*

25 | *5.1(d) and (f) of the Monticello Agreement and as reflected in defendants Responses to*

26 | *Interrogatories, Plaintiff's Exs. 16-19).*[11]

27 |

28 | [10] Double Bogey received its first money back from Appian on January 28, 2000.  *(Defendants'*
*Ex. S).*
[11] For purposes of this appeal, it does not matter how much Double Bogey is owed. If Double

Opening Brief of Appellant Double Bogey
3:12-cv-01877 SI

The Eneas made a Motion for Judgment pursuant to Rule 52(c) at the conclusion of Double Bogey's case.  In response, the Court made the following findings of fact and conclusions of law:

(1)    Appian was a fiduciary to Double Bogey with respect to Monticello and Monterrosa.  *(Transcript of Proceedings February 10, 2012, p. 6:8-14, 10:1-3).*

(2)    Double Bogey did not receive "substantial amounts" of interest and profits back from its Monticello investment with Appian.  *(Id. p.5:15-22); and*

(3)    Double Bogey established a *prima facie* case that the Eneas were the *alter ego* of Appian. *(Id. p. 8:2-24).*

Despite these findings, the Court then held that Double Bogey had not stated a *prima facie* case of defalcation against the Eneas under Section 523(a)(4) and granted judgment for defendants on all counts.

## SUMMARY OF ARGUMENT

A debt for "fraud or defalcation while acting in a fiduciary capacity" is non-dischargeable under Section 523(a)(4).  Double Bogey made a *prima facie* showing of "defalcation"—defined as the failure to account for money or pay it over when due—against Appian, its admitted  corporate fiduciary.  Double Bogey also made a *prima facie* showing that Paul and Vesty Enea were Appian's *alter ego*.  Given these findings, the Eneas are liable for a "debt for defalcation" either as the *"alter ego"* of Appian, the nominal fiduciary, or directly, because they personally committed the defalcation and, when they signed the operative Monticello and Monterrosa Agreements, they were in essence signing on their own behalf.  Rule 7052(c) states that the court "may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."  Here, the Court entered judgment against Double Bogey even though it proved a claim for defalcation.  That Judgment must be reversed.

///

///

Bogey is owed anything at all, or if Appian has failed to account fully for Double Bogey's

Opening Brief of Appellant Double Bogey
3:12-cv-01877 SI

**ARGUMENT**

I.      **The Bankruptcy Code Does Not Allow Debtors To Walk Away From Debts Listed in Section 523 Of the Code.**

The Bankruptcy Code is generally intended to provide debtors with a 'fresh start' by discharging pre-bankruptcy indebtedness.  But debt is not discharged if it was incurred through specific behaviors that the Act proscribes.  These specific debts, listed in Section 523, are "excepted" from a debtor's discharge.  They are excepted because Congress has determined that "the creditor's interest in recovering full payment of debts in these categories outweighs the debtors' interest in a complete fresh start."  *Cohen v. De La Cruz*, 523 U.S. 213, 222 (1998).  Debts arising from a fiduciary's misconduct are one such category of debts "excepted" from discharge.  Specifically, debt for "defalcation…while acting in a fiduciary capacity" is non-dischargeable.  11 U.S.C. Section 523(a)(4).

II.     **Double Bogey Proved Defalcation By A Fiduciary.**

a.      **Appian Was Nominally a Fiduciary To Double Bogey Under Section 523(a)(4) with Respect to Double Bogey's Investments in Both Monticello and Monterrosa.**

A debt is non-dischargeable under Section 523(a)(4) where: (1) the debtor acted as a fiduciary to the creditor at the time the debt was created: (2) there is an express, technical or statutory trust; and (3) the debt was caused by defalcation [defined as failure to account for or pay over monies entrusted in a fiduciary capacity].  *Otto v. Niles (In re Niles),* 106 F.3d 1456, 1459 (9th Cir. 1997); *Banks v. Gill Distrib. Ctrs., Inc. (In re Banks),* 263 F.3d 862, 870 (9th Cir. 2001).   In the Ninth Circuit, partners are fiduciaries to each other within the meaning of Section 523(a)(4).  *Ragsdale v. Haller*, 780 F.2d 794, 796, 797 (9th Cir. 1986).  Furthermore, the manager of a Limited Liability Company owes its members the same fiduciary duties as a partner owes to its partnership and fellow partners.  *Cal. Corp. Code Section 17153.*   Appian was the General Partner of Monticello and the Managing Member of Monterrosa.  Thus, the Court correctly found that Appian was a fiduciary to Double Bogey with respect to both Monticello and Monterrosa.

investment, there is defalcation.

### b. Appian Was Nominally The Trustee Over and Had to Account For All Assets of Monticello and Monterrosa.

The first and second elements of a defalcation claim are intertwined. That is, the law that creates the fiduciary relationship for the purposes of Section 523(a)(4) often defines and creates the express, technical or statutory trust. *Ragsdale*, 780 F.2d at 796-97; *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1186 (9th Cir. 1996).

In *Ragsdale*, the Court found that the debtor was a fiduciary to the creditor for the purposes of Section 523(a)(4) because applicable case law "made all partners trustees over the assets of the partnership." *Ragsdale*, 780 F.2d at 796. That case law "raised the duties of partners beyond those required by the literal wording of [California Corporations Code] Section 15021."[12] Thus, because "state law makes clear that a partner necessarily is a trustee over partnership assets for all purposes, then that partner is a fiduciary within the narrow meaning of Section 523(a)(4)." *Id.* at 797. The partnership assets in *Ragsdale* consisted of a boat jointly owned, a fishing permit, payments made for fish caught and all profits from the enterprise; these were the *"res"* for which Ragsdale had to account.

In *Lewis*, the Ninth Circuit first found that Arizona law imposes on partners a fiduciary duty within the meaning of Section 523(a)(4). It then held that debtors committed defalcation when they "failed to provide a complete accounting of the funds [plaintiff] invested in the partnership or of the partnership assets generally." *Lewis*, 97 F.3d at 1187. In so doing, the Ninth Circuit treated both plaintiff's investment in the partnership and "all partnership assets" as the "res" for purposes of Section 523(a)(4). As it held, "defalcation is a " 'misappropriation of trust funds or money held in any fiduciary capacity; [t]he failure to properly account for such funds.' " *Lewis*, 97 F.3d at 1186. Similarly, in *Niles*, the court held that the same law that created the fiduciary relationship at the same time made the debtor the "trustee of an express trust." *Niles*, 106 F. 3d at 1459.

Double Bogey invested $5.259 million with Appian—its nominal partner in Monticello

1  and the managing member of Monterrosa.  Just as California law impressed a trust on the

2  partnership monies invested by the creditors in *Ragsdale* and *Lewis,* these monies were

3  impressed with an "express, technical or statutory" trust and Appian (and its alter ego) had to

4  account fully for the use of that money and pay over any profits or other amounts owed or be

5  liable for defalcation.

6       In its ruling, the Court stated:

7            [T]here is no identification of any particular fund of money.  There is no statute

8            that says every dollar that comes into Monticello, to Appian, is impressed with the trust.  There's no res.

9  *(Transcript of Proceedings February 10, 2012, p. 15:5-9).*  This statement appears in the Court's

10  analysis of Double Bogey's claims against the Eneas for *direct liability* and may be applicable

11  only to that analysis, not to their liability as *alter egos*.  In either event, it is incorrect.

12       First, it is case law—not statute—that impresses money invested by one partner with

13  another partner with an express trust under California law.  In *Niles,* the Court stated that the

14  California statute would indeed impress a trust "*ex malefico*" –from wrongdoing—and would not

15  be the type of trust required under Section 523(a)(4).  *Niles*, 780 F. 2d at 797.  But because case

16  law "raised the duties of partners" beyond that statute, California partners are fiduciaries to each

17  other for purposes of Section 523(a)(4); it is that same law that creates the "res"—the partnership

18  assets—as discussed above.  The Monticello and Monterrosa assets are the "particular fund of

19  money" for which Appian (and its alter ego) had to account and included Double Bogey's

20  investments of $5,259,000, which Double Bogey invested with Appian as its General Partner

21  (Monticello) and its Managing Member (Monterrosa) pursuant to the Monticello and Monterrosa

22  Agreements.

23       Moreover, Double Bogey argued only that money it invested with Appian for the

24  *Monticello* and *Monterrosa* projects was impressed with a trust, not money that Appian received

25  directly from other sources or from other projects.  But once Double Bogey's money was so

26  entrusted, what Appian did with that money could not and did not strip it of its characteristics as

27  trust monies.  That is, if Appian immediately moved the capital contribution from a Monticello

28  account to an Appian account and spent it, Appian still had to account for its use; that money

was still "entrusted."  Similarly, if Appian used Double Bogey's money to purchase properties for Monticello which it then developed and sold, the proceeds from that sale were also impressed with a trust, under the Niles and Ragsdale reasoning.

The Court went on to state that "the very nature of the investment of Double Bogey in Monticello and Monterrosa  impliedly….recognizes that those monies would be spent." *(Transcript of Proceedings February 10, 2012, p. 15:13-19.)*  This is true but it misses the point. That Appian was entitled to use the partnership or limited liability assets *for appropriate partnership purposes* is undisputed.  The Court mistook Appian's right to "use" the money with its obligation to "account" for that use at the end of the day and to "pay over" any monies due. Every fiduciary is entitled to use of the money entrusted, else why would it be entrusted?  As in *Ragsdale,* as in *Niles* and the other cited cases, Appian, as fiduciary, was entitled to use of the money Double Bogey entrusted to it.   But—as explained more fully below—every fiduciary is required to *explain* what use he made of the money and to *return* what is owed.

### c.    Neither Appian Nor its Alter Ego Accounted Fully For Double Bogey's Investment Nor Paid Over to Double Bogey Money Admittedly Owed To It: Under Applicable Ninth Circuit Authority, This Is Defalcation.

Defalcation occurs when there is a failure to *account for* or *pay over* monies that were entrusted in a fiduciary capacity.  *Niles,* 106 F.3d at 1462.  To avoid liability, the fiduciary must account not only for the original investment but also for any profits made on the investment. *Lewis v. Short (In re Short),* 818 F.2d 693, 694, 696 (9th Cir. 1987) (defalcation consisted of misconduct in managing joint venture profits); *Ragsdale,* 780 F. 2d at 794, 796, 797.  When the accounting shows that monies are due, that money must be paid over or there is defalcation. *Blyler v. Hemmeter (In re Hemmeter),* 242 F. 3d 1186, 1191 (9th Cir. 2001); *Woodworking Enterprises, Inc. v. Baird (In re Baird),* 114 B.R. 198, 204 (B.A.P. 9th Cir. 1990).[13]

---

[13] In the Ninth Circuit, a fiduciary's acts need not be negligent or intentional to create a non-dischargeable debt: defalcation may be "innocent."  *Lewis,* 97 F.3d at 1186-87, overruling *Martin v. Fidelity & Deposit Co.* (*In re Martin*), 161 B.R. 672, 678 (B.A.P. 9th Cir. 1993); *Federal Deposit Ins. Corp .v. Jackson,* 133 F.3d 694, 703 (9th Cir. 1998), citing *In re Lewis. Stevens v. Briles (In re Briles*), 228 B.R. 462, 467 (Bankr. S.D. Cal 1998); *See also Rogone v. Correia-Sasser (In re Correia-Sasser),* 2011 Bankr. LEXIS 3072 at *13 (Bankr. 2011) (an innocent breach of fiduciary duty is defalcation).

To avoid liability for defalcation, a fiduciary must "persuade the court that "[it] complied with its fiduciary duties with respect to all questioned transactions." *Niles*, 106 F. 3d at 1462. It must show that it kept regular books and accounts; it must show what funds were received and how they were applied; it must "explain all transactions taken on the principal's behalf." *Niles*, 106 F.3d at 1461-1462 *(dicta)*. This burden is one of *proof,* not just *production*.

> The duty of a trustee…to keep regular and correct accounts is imperative. If he does not, every presumption of fact is against him. He cannot impose upon his principal…the obligation to prove [what] he has actually received…By failing to keep and submit accounts, he assumes the burden of repelling the presumption and disproving negligence and faithlessness.

*Id.* citing *Landis v. Scott*, 32 Pa. 495 (Pa. 1859). As the Ninth Circuit reasoned, "the evidence of what funds were received by the fiduciary and how they were applied is more likely to be accessible to the fiduciary than to the principal." *Niles,* 106 F.3d at 1462

Throughout the bankruptcy proceedings, the Eneas admitted that they could not account fully for Double Bogey's investment. *(Defendants' Responses and Supplemental Responses to First Set of Requests for Production Nos. 19, 20, 21, 22, Plaintiff's Trial Exhibits 11 to 15, stating that defendants had "no responsive documents" showing the purpose for millions of dollars of checks/transfers from the Monticello and Monterrosa accounts).* The Eneas also conceded that what calculations they had done showed that Appian did owe Double Bogey substantial amounts of money.[14] Paul Enea calculated that the amount owed Double Bogey was $1.6 million. The Court accepted this admission and found that Double Bogey did not receive "substantial amounts of interest [and] profit participation" for the Monticello investment. *(Transcript of Proceedings February 10, 2012, p. 515-22).* These facts establish a defalcation claim against Appian under Section 523(a)(4).

In *In re Baird*, The Ninth Circuit Bankruptcy Appellate Panel employed the same reasoning to hold that a *corporate entity* had committed defalcation under Section 523(a)(4). The questions posited by the Panel were first "whether *Baird Construction* [the corporate entity] committed a defalcation" and, second, "if so, whether the debtor…is personally liable for the

---

[14] The Eneas' calculated what money was owed Double Bogey by project by referencing a "green binder" compiled by Judy Jarvis, their former bookkeeper. The Eneas lost track of this "green binder" —plaintiff's counsel had to locate it for them during trial—it was found at their prior

defalcation."   *Baird,* 114 B.R. at 204 (emphasis added).

Baird Corporation and its president and sole shareholder were charged with failing to pay to Woodworking Enterprises monies held in trust by the corporation.  However, the statute in question imposed a "fiduciary capacity" only on the *corporate* entity, Baird Construction.  The Panel held that the creditor established a *prima facie* case of defalcation—failure to pay over funds—against the corporate entity.  *Baird,* 114 B.R. at 204.   The Panel described the defalcation as the debtor's failure "to account for the trust funds by their application solely to those providing goods and services on the Garrigan residence."  The Panel went on to hold the debtor directly liable, as discussed below.   Thus, just as in Baird, Double Bogey established "defalcation" under the statute.

### III.   The Eneas Are Liable for The Defalcation Under Section 523(a)(4) Either As Appian's *Alter Ego* Or Directly.

Once Double Bogey established defalcation, the only remaining question was whether defendants were liable for that defalcation.  Double Bogey argued that they were both directly liable and liable as Appian's *alter ego*.

#### a.   The Eneas Are Liable for the Defalcation As Appian's *Alter Ego*.

The *alter ego* doctrine "is an equitable remedy that fastens liability for all kinds of corporate debts on shareholders of the corporation."  Elizabeth E. Brown, *A Guide to Winning Alter Ego Claims*, American Bankruptcy Institute Journal, June 1996, 15-5 ABIJ 15.

> As the separate personality of the corporation is a statutory privilege, it must be used for legitimate business purposes and must not be perverted. When it is abused it will be disregarded and the corporation looked at as a collection or association of individuals, so that the corporation will be liable for acts of the stockholders or the stockholders liable for acts done in the name of the corporation.

*Mesler v. Bragg Management Co.* (1985) 39 Cal. 3d 290, 300.

In California, *alter ego* liability requires that: (1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will

counsel's office.  *(TR Dec. 27 p. 3:23-4:9)*

Opening Brief of Appellant Double Bogey
3:12-cv-01877 SI

follow. *Riddle v. Leuschner,* 51 Cal. 2d 574 (1959);[15] *Watson v. Commonwealth Ins. Co.*, 8 Cal. 2d 61, 68 (1936); *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal. App. 2d 825, 838-840 (1962).  Federal law in the Ninth Circuit is similar.[16]

The *alter ego* doctrine applies in the bankruptcy arena.

> Where corporate and individual affairs are badly intermingled and it would be unjust to recognize the distinction between individuals and corporations, courts will hold the individuals liable for corporate debts and vice versa. 4 Daniel R. Cowans, *Bankruptcy Law and Practice*, S 16.8, p. 147 (7th Ed. 1998).

*Toubin v. Sans Souci Ltd Pshp (In re Toubin),* 258 B.R. 199 (B.A.P. 9th Cir. 2001).[17]  It also applies to non-dischargeability claims.  *Yarbrow v. FDIC (In re Yarbrow),* 150 B.R. 233 (B.A.P. 9th Cir. 1993).  In *Yarbrow*, the BAP upheld a non-dischargeability judgment against an individual debtor because he was the alter ego of the corporation against which the FDIC had a deficiency judgment.  *Baird,* 114 B.R. at 204, also acknowledges the applicability of *alter ego* to claims against a corporate officer under Section 523(a)(4).[18]

---

[15] Paul and Vesty are both Appian's *alter ego*.  *Riddle*, 51 Cal. 2d at 111-112; "two or more shareholders…may be liable … under the alter ego principal."  *See also Sweet v. Watson's Nursery*, 33 Cal.App. 2d 699 (1939).   And equitable ownership, such as Vesty had, is sufficient to establish liability. *Goodrich v. Briones (In re Schwarzkopf)*, 626 F.3d 1032, 1038-1039 (9th Cir. 2010).

[16] *Seymour v. Hull & Moreland Engineering*, 605 F. 2d 1105 (9th Cir. 1979) (the "three general factors" considered are: (1) the amount of respect given to the separate identity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; (3) and the fraudulent intent of the incorporators)."  In the Ninth Circuit, the first and either the second or third element must be established.  *Board of Trustees of the Mill Cabinet Pension Trust Fund v. Valley Cabinet*, 877 F.2d 769 (9th Cir. 1989); *UA Local 343 v. Nor-Cal Plumbing*, 48 F.3d 1465 (9th Cir. 1995).

[17] Although in *Toubin* the BAP acknowledges the applicability of the *alter ego* doctrine to bankruptcy claims, in its ensuing discussion at pp. 204-06, the BAP includes only one case that applied *alter ego* principles—*Hodnett v. Loevner*, discussed above.  The other cases involved the application of agency principles, not *alter ego*.

[18] *See also Patel v. Shamrock Floorcovering Services, Inc. (In re Patel),* 565 F.3d 963, 969-970 (6th Cir. 2009) (discussing the applicability of the *alter ego* doctrine to claims under Section 523(a)(4) while finding it inapplicable in the case at bar because debtor had a direct fiduciary relationship to the creditor); *Banayan v. Mesbahi (In re Mesbahi)*, 2005 Bankr. LEXIS 3398 at * 34 (B.A.P. 9th Cir. 2005) (acknowledging the theory but finding that no evidence was presented to support a claim that the corporation was the *alter ego* of individual debtor under Section 523(a)(4)); *Weule v. Nordstrom*, 8 Fed. Appx. 823 (9th Cir. 2001) (tax returns improperly excluded by trial court in action under 523(a)(6), where returns "would probably have been probative of an *alter ego* relationship"; *ZTE Inc. v. Amoroso*, 223 Fed. Appx. 708 (9th Cir. 2007) (evidence did not establish individual defendant used his corporation as *alter ego*; subsection

15

In *Baird*, the BAP posited the exact question posed in this appeal: *whether the corporate entity committed defalcation and, if so, whether the individual debtor was liable.  In re Baird*, 114 B.R. at 204.  The BAP's answer to that question acknowledges that there are two ways by which the individual debtor could be liable once the corporate defalcation was established: (1) as the corporation's *alter ego*; or (2) directly, by having participated in the defalcation.  The BAP held that debtor liable under the second, direct theory of liability but implicitly acknowledges that a finding under the first *alter ego* theory would have been sufficient to impose personal liability.

Thus, following the logic of *Baird,* Double Bogey established "defalcation by Appian", and the Eneas are personally liable for that defalcation as Appian's alter egos.   In *Hodnett v. Loevner (In re Loevner),* 167 B.R. 824 (Bankr. E.D. Va. 1994), the court imposed liability on an individual debtor when his corporation committed defalcation.  Plaintiff invested funds with Cardinal Financial Planning (CFP), a registered management advisor, which in turn loaned the funds to a third party that did not repay them.  Debtor was the officer, director and 50% shareholder of CFP.  The court held that an express trust existed between plaintiff and CFP based on the execution of account agreements, and, because debtor was the *alter ego* of CFP, he too was in a fiduciary relationship to plaintiff and was liable for the defalcation.  *Hodnett,* 167 B.R. at 827.  As that Court reasoned:

> Debtor is not insulated from the dischargeability issues here by virtue of the fact that the transactions were done in the name of the corporation CFP. Debtor was an officer, director and 50 percent shareholder in the corporation and, most importantly, was the person who made the investment decisions concerning client funds.

*Hodnett*, 167 B.R. at 826.  So too here, because the Eneas ignored corporate formalities for Appian before they formed Monticello with Double Bogey in 1997, Appian's corporate existence must be ignored in identifying who was the general partner of Monticello.  .

In *Bombardier Capital v. Black (In re Black),* 179 B.R. 509, 516 (Bankr. E.D. Tex. 1995), Bombardier alleged that debtor Black was personally liable for the defalcation of a corporate entity,  Discount Family Boats ("DFB") and that the resulting debt was non-

523 relied on by plaintiff not referenced in opinion).

dischargeable under Section 523(a)(4). The Court first found that the *corporate* entity owed plaintiff a fiduciary duty, then that the failure of the *corporate entity* to account for money it held in that fiduciary capacity constituted defalcation. *In re Black,* 179 B.R. at 514. While the Court ultimately declined to impose liability on the individual debtor, it did so only because there was insufficient evidence to pierce the corporate veil, not because the alter ego liability theory was unsound. Id. at 515. Similarly, in *Nibbi v. Kilroy (In re Kilroy),* 357 B.R. 411, 433-34 (Bankr. S.D. Tex. 2006), the Court held that investors in a limited partnership properly pled a claim for defalcation under Section 523(a)(4), where they alleged that debtor's corporation--the general partner--and LLC in which funds were invested were *alter egos* of debtor through which debtor misused invested funds. See also *Peerless Ins. Co. v. Casey (In re Casey),* 181 B.R. 763, 767 (Bankr. S.D.N.Y. 1995) (acknowledging alter ego theory but finding insufficient allegations to support it in the case at bar).

*In re Munson*, 2011 Bankr. LEXIS 764 (Bankr. S.D. Cal. 2011), discussed in the trial court's opinion, is not on point.[19] In *Munson,* plaintiffs alleged that individual defendants Robert and Kimberly Munson *themselves* committed defalcation pursuant to Section 523(a)(4) by improperly diverting funds paid to their corporation, Munson Plumbing. Coincidentally, plaintiffs also alleged that Munson Plumbing was Robert and Kimberly's *alter ego.* Plaintiffs *did not* allege that Munson Plumbing itself committed defalcation, and that the individuals were liable as Munson's *alter ego.*

The Munsons moved to dismiss the complaint because plaintiff did not allege a fiduciary relationship between the Munsons *individually* and plaintiff. The Court agreed and, holding that there was no express trust between the parties—the Munsons individually and the creditor— dismissed the complaint.

This ruling is not on point. Because plaintiff in *Munson* charged only the *individual* defendants with defalcation, not the corporation, they *had* to allege a direct fiduciary relationship between plaintiff and the Munsons. Plaintiff tried to establish that direct fiduciary relationship

---

[19] Double Bogey requests that the Court take Judicial Notice of the Complaint, the Motion to Dismiss, the Opposition and the Reply Brief in *Suretec v. Robert and Kimberly Munson,* AP 6:11-ap-01060 SC, United States Bankruptcy Court, for the Central District of California.

by alleging, alternatively, that "(1) an express trust was created by the [General Agreement of Indemnity] which placed applicable fiduciary duties on [Robert and Kimberly Munson]; and (2) applicable fiduciary duties upon [Robert and Kimberly Munson] arose by California statutes." *Munson*, 2011 Bankr. LEXIS at *7.   However, neither the General Agreement of Indemnity nor the California statutes imposed a direct fiduciary relationship on the Munsons themselves.  The Court noted that the General Agreement of Indemnity *might* have imposed fiduciary duties on the Munson's *corporation*.  But, as the court noted, even if the defendants were the *"alter ego"* of the corporation, and even if that *corporation* owed plaintiff a fiduciary duty, *"fiduciary duties of a corporation do not flow through to corporate officers simply because of imposition of corporate debt based on the doctrine of alter ego."* [20]

Both the Court herein and the Eneas' counsel relied on this single statement from *Munson* to argue that Double Bogey had not proven its case.  Even if this statement were explained by reference to case law, *Munson* simply does not address the legal theory Double Bogey relies on, which is that Appian—an *admitted* corporate fiduciary under Section 523(a)(4)—failed to account [committed defalcation] and that the individual debtors were liable for that failure to account as the corporation's *alter ego* from the inception of the fiduciary responsibilities.  Double Bogey alleged that the liability for the corporate debt, the nature of which had been established as being a debt for "defalcation," should be imposed on the individuals who were Appian's *alter ego*.  Conversely, in *Munson,* the allegation was that the *individuals* themselves committed defalcation.  Obviously, then, there would have to be a fiduciary relationship/express trust between the individuals and the creditor.  Whether or not the Munson's were their corporation's *alter ego* was not relevant to the Court's analysis, because the corporation was not charged with defalcation.

The Court also cited *Hunter v. Philpott*, 373 F.3d 873 (8th Cir. 2004) in support of its conclusion that a trust "*ex maleficio*" is insufficient for liability under Section 523(a)(4).  This is

---

[20]  Under Ninth Circuit law, corporate officers and directors are not directly fiduciaries *to the corporation or its shareholders*. *Cantrell v. Cal-Micro, Inc. (Cantrell)*, 329 F.3d 1119 (9th Cir. 2003).   But *Cantrell* does not discuss whether a corporation's officers are liable to *third parties* such a Double Bogey under Section 523(a)(4) or *alter ego* liability.

1   a true statement but not on point.  In *Philpott*, the Eighth Circuit held that an ERISA fiduciary is

2   not a fiduciary under Section 523(a)(4).  This ruling is directly counter to Ninth Circuit law,

3   under which individual ERISA fiduciaries *are* fiduciaries under Section 523(a)(4)*.  In re*

4   *Hemmeter*, 242 F. 3d 1186 (9th Cir. 2001).  In *Philpott,* the Eighth Circuit expressly declined to

5   follow *Hemmeter.*  Philpott, 373 F. 3d at 875.

6           Moreover, as in *Munson,* the creditor in *Philpott* alleged *only* that the individual

7   committed defalcation, not that Quality Homes did.  As the Eighth Circuit thus reasoned, any

8   trust would have come into existence once Philpott committed the very act of defalcation

9   complained of, and would make Philpott a fiduciary/trustee "*ex maleficio*," that is, because of the

10  wrongdoing.  Thus, the fiduciary relationship would arise out of the very debt sought to be held

11  non-dischargeable.

12          For a debt to be non-dischargeable under Section 523(a)(4), the fiduciary status has to

13  pre-exist the creation of the debt itself.  As the Supreme Court held in *Davis v. Aetna Acceptance*

14  *Corp*., 293 U.S. 328 (1934):

15                  It is not enough that by the very act of wrongdoing out of which the contested
                    debt arose, the bankrupt has become chargeable as a trustee *ex maleficio*.  He

16                  must have been a trustee before the wrong and without reference thereto.

17  Id. at 333.   Here, the "wrongdoing out of which the contested debt arose" is defalcation--the

18  failure to account for and turn over the money owed to Double Bogey.  That occurred ***in 2007***,

19  when Double Bogey failed to receive either its profits or an accounting.  The trust/fiduciary

20  relationship was created prior to that "wrongdoing."  That is, Appian's status as a fiduciary to

21  Double Bogey, which arose upon signing the Monticello and Monterrosa Agreements, and the

22  facts that make the Eneas the *alter ego* of Appian—their failure to maintain corporate

23  formalities, their treatment of Appian's assets as their own—came both prior to defalcation and

24  bore no relation to it.

25          *Sherman v. SEC (In re Sherman)*, 658 F.3d 1009 (9th Cir. 2011), discussed in oral

26  argument, does not address *alter ego* liability.  It addresses the issue of "nominal defendant

27  disgorgement," under which a defendant who has received property after a wrong may be

28

ordered to disgorge funds that are traceable to fraud.[21]  It holds that if money is obtained by one

party by means which would make the resulting debt non-dischargeable, but is then transferred

to a third party, who files bankruptcy, the non-dischargeable nature of the debt does not transfer

to the third party/debtor.[22]

### b.     The Eneas Are Also Directly Liable for The Defalcation.

The Eneas were also directly liable for Appian's defalcation.  As the Ninth Circuit

Bankruptcy Appellate Panel explained in the *Baird* case,

> [a]n officer who causes a corporate trustee to commit a breach of trust
> causing loss to the trust administered by the corporation is personally
> liable to the beneficiaries for the loss….In the context of dischargeability
> determinations under Section 523(a)(4), various courts have held that
> where a corporation is a trustee, a corporate officer who knowingly causes
> the misappropriation of the trust property is personally liable for a breach
> of trust committed by the corporation even if the officer did not personally
> profit from the transaction….
>
> In this case, it is undisputed that the debtor is the only person responsible
> for dispersing funds held by Baird Construction. Thus, the debtor directly
> and actively participated in the defalcation and can be held personally
> liable in an action under section 523(a)(4).

*Id* at 204-205.  The court concluded that "the debtor, as the corporate officer responsible for

accounting for and disbursing funds, can be held personally liable for the defalcation which

occurred."  *Id.*  at 206.

Here, the Eneas were the only "officers" Appian had; by definition, then, and by their own

testimony, they were the only officers responsible for Appian's accounts, for the receipt of funds

from Double Bogey, the use of those funds and the failure to account for them.  *(Forde Direct ¶ 48).*

As in *Baird*, they were the only officers responsible for dispersing funds and thus "directly and

actively participated in the defalcation."  See also *Capitol Indemnity Corporation v. Interstate

Agency (In re Interstate Agency, Inc.),* 760 F.2d 121, 125 (6th Cir. 1985) (corporate officer

---

[21]  The Ninth Circuit's definition of a "nominal defendant" must be distinguished from Appian's status as a "nominal" fiduciary to Double Bogey.  The former refers to a third party unrelated to the named defendant except as a recipient of money/property from it; the latter refers to an entity that exists "in name only."

[22]   The Court also states that "we have strongly suggested that [Section 523(a)(4)] applies only in cases where the debtor is responsible for the misconduct" citing to the *Cantrell* holding that there is no fiduciary relationship between a corporate officer and the corporation.  *Sherman,* 658 F. 3d at 1014.  As the minority opinion in *Sherman* states, *Cantrell* is "simply inapposite" to the question presented in *Sherman*.  Just so, neither addresses the question presented herein.

1  that they were not liable for the "diversion" of specific monies out of the various Appian bank

2  accounts, and that there was no "res" as to which the Eneas were responsible.  Again, that

3  analysis is misdirected.  First, Double Bogey's claim is for defalcation, which is defined as the

4  "failure to account" and the "failure to pay money when owed," not diversion of money.  And, as

5  discussed above, the "res" consisted of all monies invested by Double Bogey with its admitted

6  corporate fiduciary—in *Baird* that was the debtor's corporation, here it is the money Double

7  Bogey gave to Appian to be invested in Monticello.

8                                          **CONCLUSION**

9       Double Bogey proved a *prima facie* case of "defalcation by a fiduciary" under Section

10  523(a)(4).  The judgments against it must be reversed and the case remanded for further

11  proceedings with the trial court.

12  Dated:  July 2, 2012.                             LAW OFFICES OF MIRIAM HISER

13

14                                          By: _____

15                                                 Miriam Hiser
                                                   Attorneys for Appellant
16                                                 DOUBLE BOGEY, L.P., A CALIFORNIA
                                                   LIMITED PARTNERSHIP
17

18

19

20

21

22

23

24

25

26

27

28

Opening Brief of Appellant Double Bogey
                                                   3:12-cv-01877 SI

**CERTIFICATE OF SERVICE**

The undersigned certifies as follows:

I am an attorney at the Law Offices of Miriam Hiser, 550 Montgomery, Suite 650, San Francisco, California 94111.  I am over the age of 18 and not a party to the within action.

I am readily familiar with the business practice for the collection and processing of correspondence for mailing, under which, in the ordinary course of business, mail placed for collection and mailing is deposited with the United States Postal Service on the same day with postage thereon fully prepaid at San Francisco, California.

On July 2, 2012, I served the following document(s):

**OPENING BRIEF OF APPELLANT DOUBLE BOGEY, L.P., A CALIFORNIA LIMITED PARTNERSHIP**

on the person(s) listed below:

Sylvester Frank Enea
171 Angela Avenue
Alamo, California 94507

Paul Joseph Enea
1400 Entrada Verde Place
Alamo, California 94507

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Dated:  July 2, 2012

_____
Miriam Hiser

1
2
3
4
5                          UNITED STATES DISTRICT COURT
6                         NORTHERN DISTRICT OF CALIFORNIA
7
                                              Case No. 3:12-cv-01877 SI
8   DOUBLE BOGEY, L.P., A CALIFORNIA
    LIMITED PARTNERSHIP,                      [Bankr. Case No. 09-46304
9
              Appellant,                      Adv. Proc. No. 11-3017
10                                            Adv. Proc. No. 11-3018]
         v.
11                                            [Consolidated]
    SYLVESTER FRANK ENEA and PAUL
12  JOSEPH ENEA,                              **CERTIFICATE OF INTERESTED
                                              PARTIES**
13            Appellees.
14
15          The undersigned counsel of record for DOUBLE BOGEY, L.P. certifies that the

16  following parties have an interest in the outcome of this appeal. These representations are made

17  to enable the Court to evaluate possible disqualification or recusal:

18          (1)  Double Bogey, L.P., a California Limited Partnership, appellant.

19          (2)  Sylvester Frank Enea, appellee.

20          (3)  Paul Joseph Enea, appellee.

21
22                                          _____
                                            MIRIAM HISER
23                                          Attorneys for Appellant
                                            DOUBLE BOGEY, L.P.
24
25
26
27
28